KRAUSE ET AL. *v.* BOARD OF TRUSTEES OF THE SCHOOL TOWN OF CROTHERSVILLE.

[No. 20, 305. Filed March 9, 1904.]

CONTRACTS.—*Covenants Rendered Impossible to Perform.*—*Breach of Contract.*—Where a builder entered into a contract to construct an addition or annex joined to an old building in such manner as to constitute one building, the old building to furnish partial support for the roof of the new; and the old building was struck by lightning, and everything inflammable in the old building and the new destroyed by fire, and the wall of the old building intended as a support for one end of the roof of

the new damaged and weakened so that it had to be taken 'down, the fact that the contractor unnecessarily delayed the completion of the building until its completion was rendered impossible by the destruction of the old building did not render the contractor liable for failure to perform the contract. *pp. 280–290.*

CONTRACTS.—*Construction of Building.—Destruction of Building before Completion.—Breach of Contract.*—A complaint against a builder for damages for failure to complete an annex to a building after the old building to which it was to be attached had been destroyed by fire amounted to a waiver of an alleged breach on the part of the builder to complete the building before the fire. *p. 290.*

SAME.—*Building Contract.—Destruction of Building before Completion.*— Where a contractor expended more money in the construction of an annex to a building than he received in payment therefor, and the old building was destroyed by lightning, rendering impossible the completion of the building without restoring the walls of the old building, an offer by the owner to restore the walls of the old building, made for the evident purpose of bringing suit for damages, did not change the legal rights of the parties. *p. 291.*

SAME.—*Building Contract.—Destruction of Building before Completion.—Assumsit.—Res Perit Domino.*—Where a building on which the contractor had expended more than he had received was accidentally destroyed before completion, the payments made by the owner which have gone into the property must be treated as an execution of the contract *pro tanto,* leaving the loss thereof to fall upon the owner. *p. 292.*

SAME.—*Building Contract.—Construction.*—A provision in a contract for the construction of an annex to an old building, that the owner "shall not be in any manner answerable, accountable or responsible for any loss or damage that shall or may happen to said work or any part thereof" can not be construed in such manner as to hold the contractor liable to rebuild. *pp. 292, 293.*

SAME.—*Building Contract.—Delay of Builder.—Destruction of Building.*—The fact that had a builder completed an annex to a building without delay, the owner might have insured against loss by fire, has no bearing upon the question 'of the obligation of the builder to perform his contract after the building was destroyed by fire. *p. 294.*

SAME.—*Building Contract.—Destruction of Building Before Completion.— Recovery by Builder.*—A building firm entered into a contract to construct an annex to a school building, the consideration "to be paid upon the completion of the work." The contract also provided that eighty per cent. of the value of the materials and labor would be paid as the work progressed, upon estimates furnished by the architect. The firm had progressed with the work until it would have cost but about $35 to complete the building, and had received approximately eighty per cent. of the contract price, when the old building was struck by lightning and all inflammable material in the entire building was burned,

and the walls of the old building, which were to furnish support to the annex, were so damaged that the annex could not be constructed. *Held*, that there could be no recovery by the builder either on the contract or under a common count. *pp. 294–297.*

From Bartholomew Circuit Court; *F. T. Hord*, Judge.

Action by the board of trustees of the school town of Crothersville against John Krause and others. From a judgment for plaintiff, defendants appeal. Transferred from Appellate Court, under subdivision 2, §1337j Burns 1901. *Reversed.*

*W. T. Branaman, Marshall Hacker* and *O. H. Montgomery*, for appellants.

*S. Stansifer, C. S. Baker* and *S. H. Barnes*, for appellee.

GILLETT, C. J.—This suit was instituted by appellee to recover on a bond executed by appellants for the faithful performance of a building contract. Certain of the appellants, constituting the firm of John Krause & Co., filed a cross-complaint to recover for a balance unpaid under the contract, and to this they added a paragraph on a *quantum meruit*. Issues were joined on the pleadings mentioned, and a trial resulted in a judgment in favor of appellee upon its complaint, and against said cross-complainants, on the issues tendered by them. Pursuant to request, the court found the facts specially. The findings are very long, and in the statement of the facts so found we shall not only summarize many of the findings, but shall omit matters which, for the purposes of this opinion, are irrelevant.

In October, 1898, appellee entered into a contract in writing with said John Krause & Co., whereby the latter agreed to furnish the materials for, and to erect and finish, an annex to a school building belonging to appellee, and to make certain improvements upon the latter building, for the sum of $3,853.35, "to be paid upon the completion of the work." Appellee agreed in said contract, in consideration of the agreements of said firm being strictly

kept, that it would pay said sum to said firm, but provision was made in said instrument that, as the work progressed, estimates were to be furnished by the architect of materials provided and labor performed, on which eighty per cent. of the value of said material and labor would be paid, on the presentation of said estimates, the amount so paid to be deducted from the final estimate which the contract provided for. The fifth subdivision of said contract was as follows: "The party of the first part [the school town] shall not be in any manner answerable, accountable, or responsible for any loss or damage that shall or may happen to said work or any part thereof, or for any of the materials or anything used or employed in finishing the same." Appellee reserved the right in said contract to place in position the heating apparatus and furniture at such times as it saw fit. The specifications attached to the contract provided that all the work, when finished, was to be turned over perfect, complete, and undamaged in every particular; that the whole work was to be inspected as it went on, and was to be accepted by the owner and architect before a final settlement was made. The character of the bond is indicated above.

The building to which said annex was to be attached was a two-story brick structure, and the annex was of the same height. For a distance of forty-two feet the west wall of the old building was to be the east wall of the new structure. The annex was to be so compactly and substantially joined to the old building as to constitute one building. One end of the lower sill or cord of the roof trusses was required to rest on said old wall, and the roof plates of the new building were to be fastened to the roof plates of the other building. The halls of the two buildings were to be arranged so that they would be continuous. Krause & Co. were also required under their contract to do considerable work on the old building, such as excavating, putting in underpinning, building a con-

crete floor, raising the tower, and doing the mason work in connection with the installing of the heating apparatus. On July 24, 1899, said firm had progressed with its work until it would have cost but $35 to complete the same, there being but one coat of paint and of varnish necessary to finish such undertaking; the value of the work done and materials furnished at that time, the court found to be but thirty-five cents less than the contract price. On the day aforesaid the old building was struck by lightning and thereby set fire to, and everything inflammable in both buildings was destroyed by such fire. As a result of the fire said common wall partially fell, and was so weakened that it had to be taken down. The remaining walls of the old building were also seriously injured. The court found that all that could have been done upon the old building after the fire, under said contract, was to build up the retaining walls in the furnace rooms to the floor line. It was further found that it would have been impossible for said contractors to build the roof of the annex, as provided for in the contract, without said common wall, and that without it the remainder of said structure, if built, would have been weak. With the exception of a few days' work done by two men during the week before the fire, no work had been done by said firm on said contract, according to the findings, after May 26, 1899. The court found that said firm could have completed its contract by June 15, 1899, and that it unreasonably and without excuse delayed the completion of said work. It is shown that appellee had advanced to said firm, prior to said fire, approximately eighty per cent. of the contract price. No estimates had been made or demanded.

The concluding findings of the court show that after the fire appellee requested said firm to complete its contract; that the firm refused to do so for the assigned reason that the old building was not in such condition as to make such work possible; that appellee then offered to restore

the old building, so that the firm might complete its contract, but that the firm refused to agree to do so; that appellee then demanded that said firm pay back the money advanced on the work, which demand was refused.

The questions involved in this case are in many respects quite novel, at least so far as this court is concerned. The ancient case of *Paradine* v. *Jane,* Aleyn 26, is often referred to in the discussion of the question as to whether a covenant will be discharged by a subsequent event, happening without the default of the covenantor, which renders performance impossible. That case was an action of debt to recover rent. The defendant answered that he had been dispossessed by an alien army, which had occupied the premises until after the lease expired. There was no answer as to one quarter. The court said: "Where the law creates a duty or charge, and the party is disabled to perform it without any default in him, * * * there the law will excuse him; * * * but when the party by his own contract creates a duty or charge upon himself, he is bound to make it good, if he may, notwithstanding any accident by inevitable necessity, because he might have provided against it by his contract." It will be seen that that case did not involve a question as to a covenant which it had become impossible to perform, since the defendant could pay rent, *modo et forma* as he had covenanted, notwithstanding the eviction.

We regard it as thoroughly settled that the words of a mere general covenant will not be construed as an undertaking to answer for a subsequent event, happening without the fault of the covenantor, which renders performance of the covenant itself not merely difficult or relatively impossible, but absolutely impossible, owing to the act of God, the act of the law, or the loss or destruction of the subject-matter of the contract. Where performance is thus rendered impossible, the inquiry naturally arises as to whether there was a purpose to covenant against such

an extraordinary and therefore presumably unapprehended event, the happening of which it was not within the power of the covenantor to prevent.   The tempest, for instance, may destroy that which must exist if performance of the covenant is to remain possible, and it would seem evident in such a case that it was not within the contemplation of the parties that the maker of the covenant should answer in damages for what he could in no wise control. But, on the other hand, a person entering into a charter party might be answerable for delay caused by adverse winds, since it would be presumed that the parties contracted with such a possibility in mind.   *Shubrick* v. *Salmond,* 3 Burr. 1637.

A well-known English writer on the law of contracts says:   "By the modern understanding of the law we are not bound to seek for a general definition of 'the act of God' or *vis major,* but only to ascertain what kind of events were within the contemplation of the parties."   And he further says upon the same point:   "We can not arrive, then, at any more distinct conception than this:   An event which, as between the parties and for the purpose of the matter in hand, can not be definitely foreseen or controlled. In other words, we are thrown back upon the nature and construction of the particular contract."   Pollock, Prin. of Cont., 361.

In *Hayes* v. *Bickerstaff,* Vaugh. 118, 122, it was declared that a man's covenant shall not be strained so as to be unreasonable, or that it was improbable to be so intended, without necessary words to make it such, for it is unreasonable to suppose a man should covenant against the tortious acts of strangers, impossible for him to prevent, or probably to attempt preventing.

The leading case upon the subject of subsequent events rendering performance of covenants impossible is *Baily* v. *De Crespigny,* 4 L. R. Q. B. 180.   In that case a lessor had covenanted that neither he nor his heirs or assigns

would allow any building on a piece of land of the lessor's fronting the demised premises. A railway company purchased this land under the compulsory powers of a subsequent act of parliament, and erected a station upon it. It was held that the railway company, coming in under compulsory powers, whom the covenantor could not bind by any stipulation, was "a new kind of assign, such as was not in the contemplation of the parties when the contract was entered into," and that therefore the covenantor was discharged. In the course of the opinion the court said: "There can be no doubt that a man may by an absolute contract bind himself to perform things which subsequently become impossible, or to pay damages for nonperformance, and this construction is to be put upon an unqualified undertaking, where the event which causes the impossibility was or might have been anticipated and guarded against in the contract, or where the impossibility arises from the act or default of the promissor. But where the event is of such a character that it can not reasonably be supposed to have been in the contemplation of the contracting parties when the contract was made, they will not be held bound by general words which, though large enough to include, were not used with reference to the possibility of the particular contingency which afterwards happens. It is on this principle that the act of God is in some cases said to excuse the breach of a contract. This is in fact an inaccurate expression, because, where it is an answer to a complaint of an alleged breach of contract that the thing done or left undone was so by the act of God, what is meant is that it was not within the contract; for, as is observed by Maule, J., in *Canham* v. *Barry,* 15 C. B. (80 Eng. C. L.) 597, 619, 24 L. J. C. P. 106, a man might by apt words bind himself that it shall rain to-morrow or that he will pay damages. This is the explanation of the case put by Lord Coke in *Shelley's Case,* 1 Rep. 98(c): 'If a lessee covenants to leave a wood in as good

a plight as the wood was at the time of the lease, and aft-
erwards the trees are blown down by tempest, he is dis-
charged of his covenant,' because it was thought that the
covenant was intended to relate only to the tenant's own
acts, and not to an event beyond his control, producing
effects not in his power to remedy (see Sheppard, Touch.,
173). It is on this principle that it has been held that
an impossibility, arising from an act of the legislature sub-
sequent to the contract, discharges the contractor from
liability."

In *Singleton* v. *Carroll,* 6 J. J. Marsh. 527, 22 Am.
Dec. 95, it was held that the defendant was not liable upon
his covenant to return a slave who, without the fault
of the defendant, had run away. It was there said: "The
true ground, however, generally, upon which, in such
cases, to rest the defense of the covenantor, is, that the
loss is not to be considered as provided against by a general
covenant." See, also, *Pollard* v. *Shaffer,* 1 Dal. 210, 1
L. Ed. 104, 1 Am. Dec. 239.

It has been questioned whether a fire caused by light-
ning is "an act of God," since fire can be prevented and
also extinguished, but we need not consider this point.
As to a general covenant, it is the law that the destruction
of the subject-matter of the contract, thereby creating a
physical or natural impossibility inherent in the nature
of the thing to be performed, whether occasioned by *vis
major* or otherwise, will discharge the covenant, provided
the event occurred without the fault of the covenantor.

The destruction before completion of a house which a
contractor had covenanted to furnish materials for, and
to erect and complete, will not relieve him, for perform-
ance is not thereby rendered impossible, since he may build
a new house; but if the contract is to bestow labor or ma-
terials upon a particular building, it is obvious that its
destruction prevents a compliance with the undertaking.
Pollock states that it is the admitted rule of English law

that if a chattel perish without the vendor's default, performance is excused, although the promise is in words positive.    Pollock, Prin. of Cont., 363. . Chitty says: "But in contracts from the nature of which it is apparent, that the parties contracted on the basis of the continued existence of a given person or thing, a condition is implied, that if the performance become impossible from the perishing of the person or thing, that shall excuse such performance."    Chitty, Contracts (11th Am. ed.), 1076.

In *Taylor* v. *Caldwell,* 3 Best & Sm. 826, where a music hall, engaged for concerts, had been accidentally destroyed by fire, it was held that both parties were thereby excused from the contract, because the general rule requiring absolute performance "is only applicable when the contract is positive and absolute, and not subject to any condition express or implied."    It was there also held that "where, from the nature of the contract, it appears that the parties must from the beginning have known that it could not be fulfilled unless when the time for the fulfillment of the contract arrived some particular specified thing continued to exist, so that, when entering into the contract, they must have contemplated such continuing existence as the foundation of what was to be done, there, in the absence of any express or implied warranty that the thing shall exist, the contract is not to be construed as a positive contract, but as subject to an implied condition that the parties shall be excused in case, before breach, performance becomes impossible from the perishing of the thing without default of the contractor."    See, also, *Womack* v. *McQuarry,* 28 Ind. 103, 92 Am. Dec. 306; *Jamieson* v. *Indiana, etc., Oil Co.,* 128 Ind. 555, 12 L. R. A. 652; *Lord* v. *Wheeler,* 1 Gray 282; *Schwartz* v. *Saunders,* 46 Ill. 18; *Walker* v. *Tucker,* 70 Ill. 527; *Lorillard* v. *Clyde,* 142 N. Y. 456, 37 N. E. 489, 24 L. R. A. 113; *Niblo* v. *Binsse,* 1 Keyes (N. Y.) 476; *Brumby* v. *Smith,* 3 Ala. 123; *Cook* v. *McCabe,* 53 Wis. 250, 10 N. W. 507,

40 Am. Rep. 765; *Haynes* v. *Second Baptist Church,* 88 Mo. 285, 57 Am. Rep. 413; *Hall* v. *School Dist.,* 24 Mo. App. 213; *Anglo-Egyptian Nav. Co.* v. *Rennie,* 10 L. R. C. P. 271; Platt, Covenants, 582; 9 Cyc. Law & Proc., 631, and cases cited.

The case of *Butterfield* v. *Byron,* 153 Mass. 517, 27 N. E. 667, 12 L. R. A. 571, 25 Am. St. 654, is quite in point. The court in that case, by Knowlton, J., said: "The fundamental question in the present case is, what is the true interpretation of the contract? Was the house while in the process of erection to be in the control and at the sole risk of the defendant, or was the plaintiff to have a like interest, as the builder of a part of it? Was the defendant's undertaking to go on and build and deliver such a house as the contract called for, even if he should be obliged again and again to begin anew on account of the re-peated destruction of a partly completed building by inevi-table accident, or did his contract relate to one building only, so that it would be at an end if the building, when nearly completed, should perish without his fault? It is to be noticed that his agreement was not to build a house, fur-nishing all the labor and materials therefor. His contract was of a very different kind. The specifications are in-corporated into it, and it appears that it was an agree-ment to contribute certain labor and materials toward the erection of a house on land of the plaintiff,. towards the erection of which the plaintiff himself was to contribute other labor and materials, which contributions would to-gether make a completed house. The grading, excavating, stonework, brickwork, painting, and plumbing were to be done by the plaintiff. Immediately before the fire, when the house was nearly completed, the defendant's contract, so far as it remained unperformed; was to finish a house on the plaintiff's land, which had been constructed from materials and by labor furnished in part by the plaintiff and in part by himself. He was no more responsible that

the house should continue in existence than the plaintiff was. Looking at the situation of the parties at that time, it was like a contract to make repairs on the house of another. His undertaking and duty to go on and finish the work was upon an implied condition that the house, the product of their joint contributions, should remain in existence. The destruction of it by fire discharged him from his contract."

Counsel for appellee attach much importance to the fact that under the findings of the trial court the firm of John Krause & Co. had full opportunity to perform its contract before the fire occurred. It is insisted that this case does not fall within the general rule, because some of the authorities proceed on the supposition that the reason for nonliability upon the part of the covenantor rests on the fact that the other party impliedly covenants that the premises shall remain in condition for a sufficient length of time to permit the promisor to perform his contract. It may well be said, as we have seen that Mr. Chitty states, that a condition is implied that if the performance becomes impossible from the perishing of the person or thing that shall excuse performance. Such a construction would be a fair example of the doctrine, laid down by one of the old writers, that "constructions are to be with equity and moderation, to moderate the rigor of the law." Grounds of Law and Equity, 38 ca. 49. We think that the case is one for the application of the rule declared by Lord Bacon, that "general words are restrained according to the nature of the thing or the person." Bacon, Max. Reg., 10; Wharton, Legal Maxims, 207. We fail to perceive why the covenantor should be charged with a breach that had nothing to do with the impossibility, and we can not understand how the covenantor can be relieved upon performance becoming impossible before breach, on the theory that the covenantee had violated his implied

undertaking that the premises should continue in a fit condition, where it was impossible for him to prevent the happening of the event. The view that what is made an excuse for the covenantor is to be treated as a breach by the covenantee has been exploded by *Appleby* v. *Myers,* 2 L. R. C. P. 651.

The breach of contract on the part of the firm, set out in the trial court's findings, had nothing to do with the burning of the building. As observed in *Pollard* v. *Shaffer,* 1 Dal. 210, 1 L. Ed. 104, 1 Am. Dec. 239, the property would have alike perished in the hands of the other party. The firm had proceeded to a point where the undertaking lacked but little of completion, and after the fire, when a demand to restore the work was made, the answer that performance was impossible was as sufficient, since the firm was not to blame for the destruction of the building, as it would have been had the fire occurred before the breach relied on.

Appellee's complaint does not proceed on the theory that the prior delay was a breach. The theory of that pleading is that the breach lay in the failure to proceed with the execution of the contract after the fire. The pursuit of said firm on the latter ground was a waiver of the prior breach, since the two theories are diametrically opposed to each other. If the position were taken that the delay was a breach which appellee had taken advantage of to terminate the right of performance and to seek damages on the contract, the very assuming of that position involves the view that appellee had devolved upon it the ownership of the building in its then state, together with the responsibility of ownership under the rule *res perit domino,* thus limiting the damages to the cost of completion, or $35. But this breach had to be passed over, in order that it might be asserted that said firm should have proceeded with the work after the fire,

and with the assumption of the latter position the prior breach ceased to be a factor in the case.

We do not think that the rights of the parties were changed by the offer of appellee to restore the old building. The offer was made for the purpose of changing legal rights. There is no equity in a case of this kind, where the contractors have expended more money than they received in the execution of the contract. There must be a loss to some one. As observed by Lord Ellenborough, in *Barker* v. *Hodgson,* 3 Mau. & Sel. 267, "the question is, on which side the burden is to fall." When said firm entered into the original contract, the old building was standing, and it had a right to proceed presently with its contract. Appellee has no equity to demand that said firm carry out its contract after waiting until the old building can be restored, or that said firm accommodate itself to a new undertaking which would be different from the particular work which it obligated itself to do.

There have been decisions to the effect that substantial performance of covenants will be required where exact performance has become impossible. This proposition is no doubt true, as a general rule, especially in equity. *Eaton* v. *Lyon,* 3 Ves. Jr. 690. If the essence of an undertaking can be performed, that will be required. Thus, if a man covenants to build and complete a house by a certain day, the existence of the plague will excuse him, but he will be required to perform his undertaking afterwards. Bacon's Abr., Conditions (Q). But the particular class of cases to which our inquiries relate seem to be distinguishable, in that such cases proceed on the theory that the covenantor did not, presumptively, by his general words, contract against that which afterwards rendered performance impossible, if caused by the *vis major* or the loss or destruction of the subject-matter. If he did not covenant against such possibilities, there is no basis for requiring

him to perform as near as may be.   Lord Coke states, in
his note to *Shelley's Case*, 1 Rep. 98(c), that if a lessee
covenants to leave a wood in as good a plight as it was
at the time of the lease, and the trees are blown down
by tempests, "he is *discharged* [our italics] of his covenant,
*quia impotentia excusat legem,*" and this was said, as
pointed out in *Pollard* v. *Shaffer*, 1 Dal. 210, 1 L. Ed.
104, 1 Am. Dec. 239, although it was obvious that the
lessee might have planted new trees or rendered damages
in lieu of those which had fallen.

It seems to us that if the covenantee has any remedy,
where a particular building is accidentally destroyed, it
must be in assumpsit, to recover, *ex æquo et bono,* for
advancements in excess of expenditures, if any; but where,
as here, the contractor has paid out more than he has re-
ceived, we think that the payments made, which have gone
into the property, must be treated as an execution of the
contract *pro tanto,* leaving the rule to prevail, *res perit
domino.*   See *Anglo-Egyptian Nav. Co.* v. *Rennie,* 10 L.
R. C. P. 271.

Another consideration must be borne in mind with ref-
erence to the asserted obligation of the firm to rebuild
if appellee restored the old building, and that is that ap-
pellee was not under a corresponding obligation to rebuild
for the accommodation of said firm.   Suppose that the
fire had occurred before the work on the annex had pro-
gressed to any considerable extent, would the school town
have been required to restore its building, that the firm
might avail itself of its contract?   Obviously not.   The
occurrence of a fire which practically destroyed the original
building put such a different aspect on the face of things
that it could not be said that it was within the contempla-
tion of the parties, when they entered into the contract,
that if a fire occurred the old building should be restored.
The observations of the court in *Butterfield* v. *Byron,* 153
Mass. 517, 27 N. E. 667, 12 L. R. A. 571, 25 Am. St.

654, are quite to the point upon the matter now under consideration. "It seems very clear," said the court in that case, "that, after the building was burned, and just before the day fixed for the completion of the contract, the defendant could not have compelled the plaintiff to do the grading, excavating, stonework, brickwork, painting, and plumbing for another house of the same kind. The plaintiff might have answered, 'I do not desire to build another house which can not be completed until long after the date at which I wished to use my house. My contract related to one house. Since that has been destroyed without my fault, I am under no further obligation.' If the plaintiff could successfully have made this answer to a demand by the defendant that he should do his part toward the erection of a second building, then certainly the defendant can prevail on a similar answer in the present suit. In other words, looking at the contract from the plaintiff's position, it seems manifest that he did not agree to furnish the work and materials required of him, by the specifications for more than one house, and if that was destroyed by inevitable accident, just before its completion, he was not bound to build another, or to do anything further under his contract. If the plaintiff was not obliged to make his contribution of work and materials towards the building of a second house, neither was the defendant. The agreement of each to complete the performance of the contract after a building, the product of their joint contributions, had been partly erected, was on an implied condition that the building should continue in existence. Neither can recover anything of the other under the contract, for neither has performed the contract so that its stipulations can be availed of." See, also, *Board, etc.,* v. *Louisville, etc., R. Co.,* 39 Ind. 192, 200.

It is contended by counsel for appellee that the provision of the contract that the school town "shall not be in any

manner answerable, accountable, or responsible for any loss or damage that shall or may happen to said work or any part thereof," amounted to a special provision which guarded against any implication that would leave appellee to bear any part of the loss or damage. We fail to apprehend how this provision, designed as a shield, can be converted into a sword. So far as the principal action is concerned, no one is endeavoring to hold appellee "answerable, accountable, or responsible for any loss or damage." In any event, it can not fairly be contended that this provision made said firm responsible for the integrity of the old building. As it was the destruction of the building which belonged to appellee that made performance impossible, the special provision under consideration did not extend to such a case. As against such a contingency, the contract wholly failed to provide.

There is even less of merit in the contention that if said firm had completed its contract without delay, appellee might have insured against fire. The latter had an increasing measure of risk during the progress of the work, and it was entirely optional with it whether it would insure against such risk. We can not, however, admit that the mere right or privilege of entering into a collateral contract of indemnity can have anything to do with the construction of the original covenant to build.

We now address ourselves to a consideration of appellants' cross-complaint. The contract provided for the performance of a specific and entire work, for a consideration, as to the portion thereof now in dispute, which was to be paid upon the completion of the building. The firm had reached a point where it was not entitled to any further money until it had completed its contract. To this extent, at least, the contract was unapportionable, and the performance of the whole work was a condition precedent to a recovery upon the special contract. 1 Addison, Contracts, 400. There could be no recovery upon this

contract, because it was unperformed, and the question as to the right to recover on a common count must depend upon where the loss must fall.

In respect to a substantially like agreement relative to chattels, Judge Story says: "Suppose there is a contract to do work on a thing by the job (as, for example, repairs on a ship), for a stipulated price for the whole work, and the thing should accidentally perish, or be destroyed, without any default on either side, before the job is completed, the question would then arise, whether the workman would be entitled to compensation *pro tanto* for his work and labor done, and materials applied, up to the time of the loss or destruction. It would seem, that, by the common law in such a case (independent of any usage of trade) the workman would not be entitled to any compensation; and that the rule would apply, that the thing should perish to the employer, and the work to the mechanic." Story, Bailments (9th ed.), §426b.

The subject under consideration received an exhaustive consideration in *Appleby* v. *Myers,* 2 L. R. C. P. 651. That was a case stated by consent without pleadings. The contract was to install a steam boiler, engine, etc., in a building belonging to defendant, for a consideration to be paid on the completion of the work. The building was burned before the work was finished. The court said: "Where, as in the present case, the premises are destroyed without fault on either side, it is a misfortune equally affecting both parties; excusing both from further performance of the contract, but giving a cause of action to neither." It was also pointed out by the court that there was nothing illogical in holding that the plaintiffs were not entitled to pay, since, if the accidental fire had left the defendant's premises untouched, and had only injured a part of the work of plaintiffs, they would have been required to do that part over again to fulfill their contract to complete the whole.

*Pollard* v. *Shaffer,* 1 Dal. 210, 1 L. Ed. 104, 1 Am. Dec. 239, was a suit on a covenant to deliver up demised premises at the end of the term in good order and repair. Plea, that the British army had forcibly taken possession of the premises and held the same until the term had expired, and that during said time said army had committed the waste complained of. M'Kean, C. J., in concluding an opinion well worth the perusal in connection with this case, said: "I am of opinion, that the defendant is excused from his covenant to deliver up the premises in good repair, on the 1st of March, 1778: First. Because a covenant to do this, against an act of God or an enemy, ought to be special and express, and so clear that no other meaning could be put upon it. Second. Because the defendant had no consideration, no premium for this risk, and it was not in the contemplation of either party. And lastly, because equality is equity, and the loss should be divided—he who had the term will lose the temporary profits of the premises, and he who hath the reversion, will bear the loss done to the permanent buildings."

The rule *res perit domino* is very influential in all cases of this general character, and the only question is as to the application of the rule. See Story, Bailments (9th ed.), §§426, 426a. The following authorities support the view that the members of said firm can not recover on their cross-complaint: *Brumby* v. *Smith,* 3 Ala. 123; *Siegel, etc., Co.* v. *Eaton, etc., Co.,* 165 Ill. 550, 46 N. E. 449; *Lumber Co.* v. *Purdum,* 41 Ohio St. 373; *Fildew* v. *Besley,* 42 Mich. 100, 3 N. W. 278, 36 Am. Rep. 433; Bishop, Contracts, §588. As applied to this case, we may well adopt the following, which we take from 15 Am. & Eng. Ency. Law (2d ed.), 1090: "In a case of this nature, the defendant [owner] receives no benefit, and, if he is equally blameless and irresponsible for the accident by which the property is destroyed, why should not the law

leave the parties as it finds them, and let each suffer his own loss ?"

We think that neither said firm nor the appellee was entitled to recover in this case. Judgment reversed, with directions to the trial court to restate its conclusions of law and to render judgment in accordance with this opinion.