FILED

Aug 29 2023, 9:16 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



APPELLANT *PRO SE*

James K. McConnell
Decatur, Indiana

ATTORNEYS FOR APPELLEES

Jeremy J. Grogg
Burt Blee Dixon Sutton & Bloom
Fort Wayne, Indiana

James J. O'Connor, Jr.
Rachel K. Steinhofer
Barrett McNagny LLP
Fort Wayne, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

James K. McConnell,

*Appellant-Plaintiff,*

v.

Martha A. Doan; Marilyn S. Hall; David Fee; Jerome Henry, Jr.; Thomas B. Walsh; Tim Miller; and Nicolas Ciocca;

*Appellees-Defendants.*

August 29, 2023

Court of Appeals Case No. 23A-CT-145

Appeal from the Allen Superior Court

The Honorable Craig J. Bobay, Judge

Trial Court Cause No. 02D02-1901-CT-57

**Opinion by Judge Bradford**
Judges Riley and Weissmann concur.

**Bradford, Judge.**

## Case Summary

[1] In 2019, James McConnell filed a derivative shareholder lawsuit against Martha Doan, Marilyn Hall, David Fee, Jerome Henry, Jr., Thomas B. Walsh, Tim Miller, and Nicolas Ciocca (collectively, "Appellees"), who comprised the then-board of directors of F. McConnell & Sons ("FMS"). In May of 2022, McConnell and Appellees executed a settlement agreement ("the Agreement"), pursuant to which FMS would redeem shares held by McConnell and sever his connection with the company. McConnell, however, began refusing to perform according to the terms of the Agreement and was eventually held in contempt of court for failure to obey several court orders. In the commercial court's contempt order, it, *inter alia*, appointed a commercial court master ("CCM") pursuant to Indiana Commercial Court Rule 5 and Indiana Rule of Trial Procedure 70 to take the necessary steps to satisfy McConnell's contractual obligations. McConnell contends that the commercial court abused its discretion in appointing a CCM pursuant to Commercial Court Rule 5 and Trial Rule 70 and that the Agreement is an unenforceable "agreement to agree" at a later date. Because we disagree with both contentions, we affirm.

## Facts and Procedural History

[2] On January 28, 2019, McConnell filed a derivative shareholder lawsuit against Appellees. On May 20, 2022, McConnell and Appellees executed the Agreement. The Agreement states, in relevant part:

> 1. Mechanism for Settlement.
>    a. The Parties agree to submit the most recent audited financial information for F. McConnell & Sons, Inc. ("FMS") from Katz Sapper Miller to an investment firm

for purposes of providing an opinion regarding the value of Jim McConnell's shares in FMS determined from the net enterprise value of FMS including the fair market value of its real estate minus any real estate indebtedness (together, "Per Share Value of FMS"). […]

b. Upon the completion of the calculation of the Per Share Value of [] FMS, FMS shall redeem Jim McConnell's FMS shares at the per share value determined by the investment banker, including any shares that he will possess in the future upon dissolution of the Trust that currently holds approximately 247 shares of FMS. The intent and purpose of this agreement is to ensure that all of Jim McConnell's current or future shares in FMS are redeemed.

c. The Per Share Value of FMS, as calculated by the investment banker, is binding on FMS, Defendants, and Jim McConnell.

Appellant's App. Vol. II pp. 102–03. The parties further agreed that McConnell would have "no further involvement with FMS, directly or indirectly[.]" Appellant's App. Vol. II p. 103.

[3] After receiving notice of resolution of the claims, the commercial court held a conference on May 23, 2022, at which time the parties reported the intent to stipulate to the appointment of a CCM, specifically an investment banker, to "assist in performing work necessary in fulfilling the terms of the comprehensive settlement agreement." Appellant's App. Vol. II p. 86. On May 26, 2022, Greenwich Capital Group ("Greenwich"), the investment banker chosen to perform the per-share valuation, provided the parties with an engagement letter outlining the scope of services and fees relating to the valuation to be performed.

[4]     On June 17, 2022, FMS received correspondence from McConnell indicating that he had transferred eighteen of his shares in FMS to eight individuals. On June 21, 2022, Appellees moved to enforce the Agreement, find McConnell in contempt of court, order return of funds, and award them attorney's fees. McConnell had also refused to engage Greenwich to perform the valuation as required pursuant to the Agreement and had refused to authorize his then-counsel to agree to file the stipulation to appoint Greenwich as a CCM to perform the valuation.

[5]     On August 4, 2022, the commercial court granted Appellees' motion to enforce, ordering the following specific actions:

2. Consistent with the parties' settlement agreement, the Court ORDERS the parties to file a Stipulation for Appointment of [CCM] by August 12, 2022;
3. Consistent with the settlement agreement, the Court ORDERS the parties to file a joint motion to stay the relevant proceedings pending in Adams County;
4. The Court ORDERS Plaintiff James K. McConnell to unwind the purported transfer of shares that occurred on or about June 15, 2022;
5. The Court ORDERS the parties to work together, along with the Trustee and Trustee's counsel, to effectuate a redemption of Plaintiff James K. McConnell's Trust Shares, and that the process to effectuate the redemption of Plaintiff James K. McConnell's Trust shares shall not be a basis upon which all other aspects of the parties' settlement agreement be delayed; and
6. The Court sets this matter for a hearing on November 8, 2022 at 2:30 (Courthouse, Room 316), at which time the Court will:

6.1 Hear evidence and require Plaintiff James K. McConnell to show cause why he should not be found in contempt of court failing to comply with this Court's Orders; and

6.2 Determine whether to impose sanctions against Plaintiff James K. McConnell, which sanctions may include: reimbursement of Defendants' reasonable attorney fees associated with enforcement of the settlement agreement in all respects; return of the initial consideration that Defendants paid to Plaintiff James K. McConnell pursuant to the settlement agreement; and any other sanction the Court deems reasonable in light of the demonstrated efforts and relative progress made by Plaintiff to comply with the settlement agreement and this Court's Order.

7. Plaintiff James K. McConnell and all counsel must personally appear at the November 8, 2022 hearing.

Appellant's App. Vol. II pp. 169–70.

[6] On August 12, 2022, the parties filed a stipulation to appoint a CCM. On August 16, 2022, the commercial court appointed Greenwich to be CCM, to "provide the Per Share Market Value of [FMS] in accordance with an engagement letter with Greenwich to be reasonably agreed to[,]" and determine "the information needed for the purpose of performing the calculation of the Per Share Market Value of FMS." Appellant's App. Vol. II pp. 174–75.

[7] As it happens, McConnell failed to provide Greenwich with an appropriate and reasonable engagement letter because he repeatedly suggested terms that contradicted the terms of the Agreement. On November 3, 2022, Appellees filed their report to the commercial court with regard to the conduct of McConnell and their request for relief because of his continued refusal to engage Greenwich to perform a valuation of his FMS shares ("the Contempt

Report"). As of the date of filing the Contempt Report, McConnell had also taken no action to unwind his transfer of FMS shares.

[8] Because of McConnell's ongoing lack of cooperation, including his refusal to obey the commercial court's orders of May 23, August 4, and August 16, 2022, Appellees requested the appointment of a CCM pursuant to Commercial Court Rule 5 and Trial Rule 70 to fulfill the terms of the Agreement, including undertaking any action necessary to transfer McConnell's shares in FMS and unwinding McConnell's transfer of his FMS shares.

[9] On November 8, 2022, the commercial court found McConnell in contempt of the commercial court's orders of August 4 and 16, 2022, and ordered the following specific relief:

> 3. The Court finds and concludes that James McConnell has no intention of following the terms and conditions of the [Agreement] reached in this matter on May 20, 2022. The Court also finds and concludes that James McConnell has demonstrated that he has no intention of following the above-referenced August 4, 2022, and August 16, 2022 Orders of the Court. James McConnell is therefore found in contempt of the Court's Orders. […]
>> 3.1 The Court Orders [FMS] to engage [Greenwich], the previously appointed [CCM], for purposes of determining the per share market value of the shares of FMS, consistent with the terms of the [Agreement] and consistent with the Court's August 16, 2022 Order Appointing [CCM]. As James McConnell has unreasonably failed to engage Greenwich, engagement by FMS alone is sufficient to engage Greenwich, and it is not required that any engagement of Greenwich include James McConnell's signature;

3.2 Consistent with Indiana Commercial Court Rule 5 and Indiana Trial Rule 70, the Court permits Defendants to file a Motion to Appoint a Special Master, for the purpose of appointing a Special Master to execute all required documentation to effectuate the redemption of James McConnell's FMS shares upon completion of the valuation by Greenwich. […]

3.3 On or about June 15, 2022, James McConnell attempted to thwart the [Agreement] and subsequently failed to comply with the Court's Orders by his actions related to the purported transfer of his FMS shares. Consistent with Indiana Commercial Court Rule 5 and T.R. 70, the Court also permits Defendants to file a Motion to Appoint a [CCM] for the purpose of authorizing a Special Master to approach the Purported Transferees […] to execute appropriate Waivers and/or Disclaimers of Interest, prepared by FMS, relating to the shares James McConnell purportedly transferred on or about June 15, 2022[.]  If the [CCM], for any reason, is unable to obtain the appropriate Waivers and/or Disclaimers of Interest from any of the Purported Transferees, the [CCM], pursuant to Indiana Commercial Court Rule 5 and T.R. 70, is authorized to execute the appropriate Waivers and/or Disclaimers of Interest.  The [CCM] shall also be authorized to undertake any and all other actions necessary, including interpleading any of the Purported Transferees into this litigation, to address the Purported Transfers such that the subject shares in FMS will be redeemed by FMS, as contemplated in the [Agreement];

3.4 The Court finds and concludes that the above-referenced Purported Transfers were, and are deemed, void ab initio.  The Court Orders that James McConnell shall not undertake any actions to transfer any shares in FMS other than for purposes of FMS

redeeming James McConnell's shares in FMS as required by the [Agreement];

3.5 The Court Orders that FMS is authorized, as reasonably necessary, to issue duplicate stock certificates in James McConnell's name to facilitate proper redemption of all shares of James McConnell in FMS in accordance with the [Agreement] and the above-referenced prior Orders of the Court. In the event FMS issues such duplicate stock certificates, FMS shall hold said certificates until they are redeemed by FMS, and the certificates shall not be placed into the possession of James McConnell; and

3.6 Consistent with Indiana Commercial Court Rule 5 and T.R. 70, the Court permits Defendants to file a Motion to Appoint a [CCM] for the purpose of authorizing the [CCM] to execute all documentation necessary to effectuate the redemption of any and all shares that James McConnell will possess in the future upon the dissolution of the Trust that currently holds approximately 247 shares of FMS (the "Trust Shares"). This execution is in accordance with Paragraph 1(b) of the [Agreement]. […]

    3.6.1 The [CCM] shall be authorized to execute an appropriate Redemption Agreement for the Trust Shares. That Redemption Agreement shall become effective upon the dissolution of the Trust and the distribution of the Trust Shares to James McConnell. The Redemption Agreement will be held in Escrow by the [CCM] until the dissolution of the Trust; and

    3.6.2 Upon completion of the valuation by Greenwich, FMS shall provide funds to the [CCM] equal to the per share market value of the Trust shares. Those funds will be held by the [CCM] in escrow for purposes of payment to James McConnell upon dissolution of the Trust.

Appellant's App. Vol. III pp. 60–63. On December 20, 2022, the commercial court issued its order appointing Edward E. Beck to be CCM to enforce the terms of the Agreement. McConnell contends that the commercial court abused its discretion in appointing CCM Beck and that the Agreement is unenforceable.

## Discussion and Decision

### I. Appointment of CCM Beck

#### A. Commercial Court Rule 5

Indiana Commercial Court Rule 5 provides, in part, as follows:

> (1) […] A Commercial Court Judge may appoint a [CCM] in any case pending on the commercial court docket if:
> > a. All parties consent to appointment of a [CCM]; or
> > b. If all parties do not consent, the Court, after giving notice to the parties and an opportunity to be heard finds it probable that:
> > > i. Appointment of a [CCM] will materially assist the Court in resolving the case in a just and timely manner[.]

We review a commercial court's appointment of a CCM for an abuse of discretion. Ind. Comm. Ct. R. 5, cmt. ("[T]he ultimate scope of the Order is dictated by that which is necessary and appropriate under the circumstances, and is left to the sound discretion of the Court.").

We have little hesitation in concluding that the commercial court acted within its discretion pursuant to Commercial Court Rule 5 when it appointed CCM Beck. The commercial court's order does nothing more than grant CCM Beck the power to do the things that McConnell has been ordered to do but has

refused—and *only* those things. Moreover, it is clear that CCM Beck's appointment will materially assist the commercial court in resolving the case in a just and timely manner, as McConnell's continuing refusal to do things he has been ordered to do—and, by the way, *agreed* to do by executing the Agreement—prevents the case from being resolved.[1] The commercial court did not abuse its discretion in appointing CCM Beck pursuant to Commercial Court Rule 5.

## B.    Trial Rule 70

[12]    Trial Rule 70 provides, in part, as follows:

> If a judgment directs a party to execute a conveyance of land, or other property or to deliver deeds or other documents or to perform any other specific act and the party fails to comply within the time specified, the court may direct the act to be done at the cost of the disobedient party by some other person appointed by the court and the act when so done has like effect as if done by the party.

We review a commercial court's grant of relief under Trial Rule 70 for an abuse of discretion. *Analytical Eng'g, Inc. v. Baldwin Filters, Inc.*, 425 F.3d 443, 449 (7th Cir. 2005). Trial Rule 70 gives a commercial court distinct and limited power to handle parties who refuse to comply with orders to perform specific acts. 22B Ind. Prac., Civil Trial Rule Handbook § 70:1.

---

[1] McConnell also seems to argue that CCM Beck has failed to comply with Commercial Court Rule 5 and cannot be held accountable. McConnell, however, points to nothing in the record to indicate that CCM Beck has acted outside the authority granted him or that McConnell would not be able to challenge his actions in the commercial court if he did.

[13]    We again have little hesitation in concluding that the commercial court did not abuse its discretion in this regard. The record indicates clearly that McConnell refused to act in accordance with the terms of the Agreement, stipulate to the appointment of Greenwich as a CCM to complete the per share valuation, execute the engagement letter with Greenwich, and unwind his purported transfers of shares. McConnell's refusal to obey any of the commercial court's specific instructions resulted in his being held in contempt of court, which had no effect on his recalcitrance. The commercial court appointed CCM Beck to step into McConnell's shoes and perform the specific acts that McConnell purposely failed to complete, which is clearly within the authority granted to it by Trial Rule 70.[2]

[14]    Although there does not seem to be any Indiana caselaw directly on point, Indiana's Trial Rule 70 is based on and nearly identical to its federal counterpart, *cf.* Ind. T.R. 70 and Fed. R. Civ. P. 70, and we may therefore look to the construction of the federal rule and legal precedent for guidance. *See Associated Truck Lines, Inc. v. Pub. Serv. Comm'n of Ind.*, 492 N.E.2d 704, 713 (Ind. Ct. App. 1986) (explaining that, where no Indiana case law is on point, we have looked to federal cases as persuasive authority). For example, in

---

[2] In *Payton v. Hadley*, 819 N.E.2d 432 (Ind. Ct. App. 2014), we did discuss, *sua sponte*, a commercial court's authority pursuant to Trial Rule 70. In *Payton*, the parties contested ownership of several parcels of land, and the commercial court appointed a special master to execute a deed on behalf of the plaintiff to transfer a parcel of land to the defendant after the commercial court had entered default judgment against the plaintiff. *Id.* at 434–35. In subsequent litigation, a third party challenged the validity of the deed executed by the special master, in part questioning the special master's authority to execute the deed. *Id.* at 438–39. We concluded that the deed signed by the special master was valid because the special master's signature had the same effect as if the plaintiff had signed the deed. *Id.* at 439.

*Analytical Engineering*, Analytical Engineering filed a declaratory judgment action against Baldwin Filters in which it sought guidance on each party's rights to patents developed during a joint venture between the parties following Baldwin Filters's termination of the joint venture. *Id*. at 447. Baldwin Filters moved for judgment on the pleadings, arguing that the agreement governing the joint venture was unambiguous and authorized Baldwin Filters to retain all rights to the patents in question. *Id*. The district court granted Baldwin Filters's motion for judgment on the pleadings, finding, however, that the unambiguous language of the agreement required Baldwin Filters to assign "any and all rights" to the patents to Analytical Engineering. *Id*. Baldwin Filters did not fully comply with the district court's order, and Analytical Engineering moved to enforce the judgment pursuant to Federal Rule of Civil Procedure 70. *Id*. at 448–49. The district court granted Analytical Engineering's motion. *Id*. at 449.

[15] In the appeal to the United States Court of Appeals for the Seventh Circuit, the central issue was whether the district court properly granted relief to Analytical Engineering under Federal Rule of Civil Procedure 70. *Id*. at 449. Examining the language of the rule, the Seventh Circuit stated, "Under Rule 70, […] a district court may direct a party to complete a specific act where the district court previously directed the same party to perform the same act […] and that party has failed to comply." *Id*. at 451. The scope of the district court's orders granting judgment on the pleadings and Rule 70 relief for Analytical Engineering was the same and, therefore, the district court had properly exercised its authority in granting it such specific relief. *Id*. The facts of this

case do not significantly differ from those in *Analytical Engineering*, and we reach the same result.

## II.    Enforceability of Agreement

[16]    McConnell also contends that the Agreement is unenforceable on the grounds that the FMS shares he holds in trust cannot be redeemed and that the Agreement is nothing more than an "agreement to agree." "Indiana strongly favors settlement agreements." *Georgos v. Jackson*, 790 N.E.2d 448, 453 (Ind. 2003). "It is well-settled that in the absence of fraud or mistake a settlement is as binding and conclusive of the parties' rights and obligations as a judgment on the merits." *409 Land Tr. v. City of S. Bend*, 709 N.E.2d 348, 350 (Ind. Ct. App. 1999) (citing *Burke v. Middlesworth*, 92 Ind. App. 394, 399, 174 N.E. 432, 434 (1930)), *trans. denied*. The parties, by counsel, negotiated the terms of the Agreement. The parties knowingly and voluntarily entered into the Agreement and, in doing so, agreed to be bound by the terms of the Agreement.

[17]    McConnell nonetheless claims that the Agreement is impossible to enforce because his FMS shares held in trust cannot be redeemed. The record, however, does not support this contention. First, the trustee's counsel outlined several options that the parties could consider in redeeming McConnell's trust shares. Moreover, McConnell, through former counsel, admitted to the commercial court that the parties had options for redeeming McConnell's trust

shares. The record simply does not support McConnell's contention that it is impossible to redeem his trust shares in FMS.[3]

[18] McConnell also argues that the Agreement is not binding because it is an agreement to agree at a future date.

> It is quite possible for parties to make an enforceable contract binding them to prepare and execute a subsequent final agreement. In order that such may be the effect, it is necessary that agreement shall have been expressed on all essential terms that are to be incorporated in the document. That document is understood to be a mere memorial of the agreement already reached. If the document or contract that the parties agree to make is to contain any material term that is not already agreed on, no contract has yet been made; the so-called "contract to make a contract" is not a contract at all.

*Wolvos v. Meyer*, 668 N.E.2d 671, 674–75 (Ind. 1996) (citation omitted).

> The question of whether an agreement is an enforceable option contract or merely an agreement to agree involves two interrelated areas: "intent to be bound and definiteness of terms." *See generally* 1 ARTHUR LINTON CORBIN AND JOSEPH M. PERILLO, CORBIN ON CONTRACTS § 2.8 at

---

[3] In any event, it seems clear that the defense of impossibility does not apply to situations in which the condition that is causing the alleged impossibility existed at the time of agreement, which is the case here.

> We regard it as thoroughly settled that the words of a mere general covenant will not be construed as an undertaking to answer for *a subsequent event, happening without the fault of the covenantor*, which renders performance of the covenant itself not merely difficult or relatively impossible, but absolutely impossible, owing to the act of God, the act of the law, or the loss or destruction of the subject-matter of the contract.

*Krause v. Bd. of Trs. of Sch. Town of Crothersville*, 162 Ind. 278, 283, 70 N.E. 264, 265 (1904) (emphasis added). In other words, whatever difficulty there may be in redeeming McConnell's trust shares existed at the time he signed the Agreement. Finally, to the extent that McConnell may be arguing that performance is impossible due to his transfer of shares, it is no defense because that particular subsequent event did not "happen without the fault of the covenantor[.]" *Id.*, 70 N.E. at 265.

131 (rev. ed. 1993). According to the Restatement (Second) of Contracts § 33 cmt. f (1979), "[p]romises may be indefinite.... The more important the uncertainty, the stronger the indication is that the parties do not intend to be bound; minor items are more likely to be left to the option of one of the parties or to what is customary or reasonable."

*Id*. at 675.

[19]     McConnell points to the following passage in the Agreement as rendering it nothing more than an agreement to agree at a later date:

> 3.      Greenwich Capital Group shall have the sole discretion to determine the appropriate procedures for resolution of all assigned matters and shall have the authority to take all appropriate measures to perform the assigned duties consistent with the engagement letter to be defined and reasonably agreed to.
>
> > 3.1.    The Parties agree that they shall have no ex parte communications with the Special Master and further agree that any information provided to, or communication with, any Special Master shall be through counsel for the Parties, and counsel for the Parties shall have the option to participate in or be present at any communication with the Special Master.

Appellant's App. Vol. II p. 172.

[20]     McConnell seems to argue that leaving the particulars of the engagement letter up to a reasonable agreement in the future and giving the parties the option to participate in communications with the Special Master renders the Agreement nothing more than an agreement to agree. Suffice it to say that these matters are relatively minor and have little to do with the essentials of the Agreement,

which, at its heart, is an agreement regarding the redemption and valuation of McConnell's FMS shares. Read as a whole, the Agreement clearly indicates an intent by McConnell and Appellees to be bound by an agreement that FMS would redeem McConnell's shares, severing his connection with the company. Because the language McConnell cites has no effect on the essentials of the Agreement, he has failed to establish that it is an unenforceable "agreement to agree."

[21] We affirm the judgment of the commercial court.

Riley, J., and Weissmann, J., concur.